UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MOHAMMAD ANJUM and<br>IMAD SALAMAH, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | No. 1:21-CV-00205 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Sometimes a community's vision for a neighborhood clashes with the vision of building owners for their specific properties. This is one of those times. In December 2020, the Chicago City Council enacted ordinances that "downzoned" (that is, imposed more limits on) four properties in the city's Logan Square neighborhood. Mohammad Anjum and Imad Salamah own (or have some connection to) two of the four properties that were downzoned. The Plaintiffs now bring this lawsuit, advancing a bevy of federal and state law claims and seeking to invalidate the ordinances.[1] R. 8, Am. Compl, ¶ 1.[2] The City of Chicago moves to dismiss for failure to state a claim. Fed. R. Civ. P. 12(b)(6); R. 13, Mot. to Dismiss. For the reasons discussed in this Opinion, the motion to dismiss is granted against the federal claims, and the Court holds

---

[1]This Court has federal-question jurisdiction over the federal law claims under 28 U.S.C. § 1331. With the federal law claims in the case, the Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a).

[2]Citations to the record are noted as "R." followed by the docket number.

off on deciding the state law claims for now, because supplemental jurisdiction might eventually be relinquished.

## I. Background

In evaluating the motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). In 1993, Salamah purchased the property located at 2854 North Milwaukee Avenue in Chicago. Am. Compl. ¶ 9. In 1996, Anjum purchased 2875 North Milwaukee Avenue, just up the block from Salamah's building. *Id.* ¶ 8. When the Plaintiffs bought their respective buildings, the properties were zoned as B2-2 Neighborhood Mixed-Use District. *Id.* ¶ 10. In defining this classification, the pertinent zoning ordinance explains that the goal is to authorize both residential and commercial uses and to spur more development than is allowed by in a B1 district:

> The purpose of the B2, Neighborhood Mixed-Use district is the same as the B1 district, but with the added objective of providing a *greater range of development options* for those *streets* where the market demand for retail and service uses is relatively low. By allowing ground-floor residential uses by-right, the B2 district is intended to help stimulate development along under-developed *streets*.

Chicago Zoning Ordinance § 17-3-0103-A (emphasis added). The more-permissive B2-2 zoning classification allows residential units to be (a) 1,000 square feet per Dwelling Unit, (b) 700 square feet per Efficiency Unit, and (c) 700 square feet per Single Room Occupancy (SRO) unit. Chicago Zoning Ordinance § 17-3-0402-A. This B2-2 classification is more permissive than B2-1 in the sense that, among other things, the residential units may be smaller than those in B2-1 (that is, a B2-2 building may house *more* residential units because each unit may be smaller in square footage). *Id.*

In 2017, Alderman Carlos Ramirez-Rosa proposed downzoning 99 parcels in the 2600 through 2800 blocks of North Milwaukee Avenue. Am. Compl. ¶¶ 23, 26. The proposal was not well received: residents and businesses complained that the proposal was too expansive, so the alderman scaled back the proposal in July 2019, seeking to rezone only 14 parcels. *Id.* ¶¶ 25, 26. On December 1, 2020, the alderman reintroduced seven ordinances, this time seeking to downzone only four properties in the 2800 block of North Milwaukee Avenue. *Id.* ¶ 34. A few days later, on December 16, the City Council enacted the ordinances: O2019-5846 downzoned the Anjum Property and O2019-5853 downzoned the Salamah Property. *Id.* ¶¶ 39, 40.

In comparison to the more-permissive B2-2 zone, B2-1 zoning (a) requires a larger minimum lot area per unit of Dwelling units from 1,000 square feet to 2,500 square feet; (b) requires a larger minimum lot area per unit of Efficiency units from 700 square feet to 2,500 square feet; and (c) prohibits Single Room Occupancy units. Chicago Zoning Ordinance § 17-3-0402-A. Put another way, B2-1 zoning cuts down on the number of allowable Dwelling units and Efficiency units in comparison to B2-2 zones, because each unit must be of larger square footage than their B2-2 counterparts.

Aside from more demanding square-footage requirements, B2-1 zoning also reduces the allowable height of buildings. Both the Anjum Property and the Salamah Property have over 25 feet of frontage. Am. Compl. ¶ 17. Based on that frontage width, the maximum building height for a B2-2 property is 50 feet whereas the

maximum building height for a B2-1 property is 38 feet. Chicago Zoning Ordinance § 17-3-0408-A.

As a result of this downzoning, the Plaintiffs allege that their properties can now only have up to 10 Efficiency units under the B2-1 zoning instead of the 20 Efficiency units they could have under B2-2. Am. Compl. ¶ 48. Not that either has residential units right now: Anjum's building has "commercial space on the first floor with *potential* residential units on the second floor." *Id.* ¶ 14 (emphasis added). The commercial space is not used either: Anjum's building has remained empty since 2015. *Id.* ¶ 20. And Salamah's building has "an operational business in the commercial space on the first floor with *potential* residential units on the second floor." *Id.* ¶ 15 (emphasis added).

## II. Standard of Review

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up).[3] The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might

---

[3]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "A complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678–79.

### III. Analysis

### A. Salamah

The Plaintiffs bring eight claims against the City. Am. Compl. ¶¶ 5–6. There is one threshold issue, however, as to Salamah: is he even the proper plaintiff for the 2854 North Milwaukee property? The City points out that Salamah cannot proceed as a plaintiff in this action because the actual owner of the property, according to public records, is a trust—not Salamah himself. R. 18, Def.'s Br., Exh. E. Indeed, Salamah does not dispute that the actual owner is a trust. R. 23, Pls.' Resp. at 27. Even if Salamah is the beneficiary of the trust, he would generally not be authorized to pursue the case as if he was an individual party. *Doermer v. Oxford Fin. Grp., Ltd.*, 884 F.3d 643, 648 (7th Cir. 2018) ("In general a trust beneficiary may not sue a third party on behalf of the trust.") (cleaned up).

Having said that, outright dismissal of the lawsuit is not the right outcome. Generally speaking, the Federal Rules of Civil Procedure generally try to navigate around technical formalities that unfairly prevent consideration of the merits. Under Civil Rule 17(a)(3), when the real party in interest is absent, the court ought to give the real party a chance to parachute into the case:

> [t]he court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, *a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted* into the action. After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest.

Fed. R. Civ. P. 17(a)(3) (emphasis added). As applied here, the trust that formally owns 2854 North Milwaukee Avenue ought to be given a reasonable time to substitute into the case. So Salamah is terminated as a plaintiff, but the trust may file a motion to substitute into the case in place of Salamah by April 6, 2022. To be clear, the other decisions in this Opinion do not apply to the trust because it is not yet a party to the case.

## B. Due Process

With Salamah's status resolved, it is time to turn to Anjum's claims. Anjum alleges that the City violated his right to due process under the Fourteenth Amendment because he "did not receive actual notice of the proposed ordinance seeking to downzone his property." Am. Compl. ¶ 68. Anjum contends that he did not receive actual notice, so he had no "meaningful opportunity to be heard with respect to the downzoning of [his property]." *Id.* ¶ 70.

To evaluate a due process claim, courts use a two-step analysis. First, the Court must determine whether the plaintiff has been deprived of a protectable liberty or property interest. *Pro's Sports Bar & Grill, Inc. v. City of Country Club Hills*, 589 F.3d 865, 870 (7th Cir. 2009). If the answer is yes, then the second question is whether the deprivation of that protected interest happened without due process of law. *Id.*

It is of course true that Anjum has a property interest in the 2875 North Milwaukee property *itself*—he owns it. Am. Compl. ¶ 8; *River Park, Inc. v. City of Highland Park*, 23 F.3d 164, 165–66 (7th Cir. 1994). But it is less certain that Anjum had a protectible property interest in the *zoning classification* of B2-2. Illinois law has long frowned on conferring a property right in a zoning classification, going so far as holding that there is "no vested right in the continuation of a zoning ordinance." *Constantine v. Vill. of Glen Ellyn*, 575 N.E.2d 1363, 1376 (Ill. App. Ct. 1991); *see also Pioneer Trust & Sav. Bank v. Cnty. of Cook*, 377 N.E.2d 21, 24 (Ill. 1978) (accepting property owner's concession that there is "no right in the continuation of a zoning classification"). This general proposition is subject to a limited exception that takes into account a property owner's substantial reliance on a zoning classification: "where there has been a substantial change of position, expenditures[,] or incurrence of obligations made in good faith" by the owner, then the property right is vested and the owner "may complete the construction and use the premises irrespective of subsequent zoning or zoning classification change." *Constantine*, 575 N.E.2d at 1376. Here, Anjum has not alleged (at least not yet) that he made any particular expenditures

based on the prior zoning classification, calling into question whether a due-process protected property right has been adequately alleged.

More to the point, even if Anjum had successfully alleged a protectable property interest, the Due Process claim would fail, because his own allegations establish that he received sufficient notice of the proposed change in zoning classification. The Seventh Circuit has held that "procedures due in zoning cases are minimal." *River Park, Inc. v. City of Highland Park*, 23 F.3d 164, 166 (7th Cir. 1994) (cleaned up). Trial-type adjudication is generally not required: "municipalities need not use adjudicative procedures to make zoning decisions." *Id.* Generally speaking, when zoning decisions are made by a legislative body, as opposed to a judicial authority, "the affected persons have no right to notice and an opportunity for a hearing: no right, in other words, to procedural due process." *Indiana Land Co. v. City of Greenwood*, 378 F.3d 705, 710 (7th Cir. 2004). It might be more precise to say that, generally, procedural due process is satisfied by the legislation itself. The underlying rationale for eschewing notice and a hearing for legislation is that a law typically sweeps broadly, and the "generality provides a safeguard that is a substitute for procedural protections." *Id.* This rationale is premised on the general notion of the political power (or at least the opportunity to try to exercise power) of *groups*: "The greater the number of people burdened by a proposed law, the easier it is to mobilize political resistance, and the likelier moreover that the burdened class includes constituents of the legislators proposing to impose the burden." *Id.*

Having said that, when legislation targets a specific individual or a small group, then the Due Process Clause might very well require some procedural protections beyond just the enactment of the legislation itself. *See Indiana Land Co*, 378 F.3d at 710. The "tinier the burdened group … the weaker is the equal-burden rationale for denying procedural rights in legislative hearings and the stronger therefore is the case for granting such rights in the name of due process." *Id.* Here, Anjum has a fair point when he complains that only four properties in the 2800 block of North Milwaukee Avenue were downzoned (though seven more were downzoned in the 2600 block). Am. Compl. ¶ 34. He rightly questions whether it is sufficient for the City to rely on a newspaper publication to provide notice about the proposed downzoning. Pls.' Resp. at 8. Indeed, Anjum asserts that he never received actual notice for the City Council hearings (which took place on December 16, 2020) at which the ordinances were schedule to be addressed on December 16, 2020. Am. Compl. ¶¶ 30, 31. After all, "due process requires notice to be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and to afform them an opportunity to present their objections." *See Zummo v. City of Chicago*, 345 F. Supp. 3d 995, 1006 (N.D. Ill. 2018) (cleaned up) (quoting *Towers v. City of Chicago*, 173 F.3d 619, 628 (7th Cir. 1999)), *aff'd on other grounds*, 798 Fed. Appx. 32 (7th Cir. Mar. 17, 2020). Using a newspaper publication to reach the small group of four does not necessarily clear the bar for reasonable notice. And, as Anjum alleges, the City had his mailing address, which is reflected on property tax bills. Am. Compl. ¶ 50.

But the requirement to use reasonable efforts "does not, of course, require that the authorities use the best possible method of notification." *Towers*, 173 F.3d 619, 628 (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). Here, in the Amended Complaint itself, Anjum concedes that the City did place a "Public Notice" sign about the upcoming hearing on the property itself. *See* Am. Compl. ¶ 32. To use Anjum's rather reluctant phrasing: the "most that happened was a 'Public Notice' signed placed on the Anjum Property in late November or early December 2020." *Id*. The hearing did not take place until December 16, 2020, so at the worst, the Notice was posted on Anjum's property around two weeks in advance of the hearing. Anjum points to no case law or circumstances that would render that advance time as too short. On the actual receipt of the Notice, it is not as if the property is in a hard-to-access, remote location. The Amended Complaint itself points to the dozens and dozens of properties on the three pertinent blocks of Milwaukee Avenue. *See* Am. Compl. ¶ 26 (referring to 99 parcels in three blocks), ¶¶ 58, 59 (map of part of the 2800 block). Indeed, Anjum lives in Chicago. *Id*. ¶ 2. And posting the Notice directly on the property is not, in effect, any different from mailing the Notice to the property. Like a mailing—and even more direct than a mailing—the City delivered the Notice right to the affected property itself, and in the circumstances that apply to Anjum here, this form of notice was reasonably calculated to apprise Anjum of the proposed ordinance.

It is worth noting too that Anjum in fact had *actual* notice of the proposed ordinances before their enactment. In the Plaintiffs' response brief, they explain that

they filed a state court lawsuit *before* the City Council voted on the ordinances. Pls.' Resp at 25. By definition, then, they knew about the proposed ordinances before the enactment. It is true that the Amended Complaint is cagier on receipt of actual notice. In the pleading, the Plaintiffs warily craft the allegation on actual notice this way: the Plaintiffs "never received any actual notice *sent to them directly*" about the proposed downzoning. Am. Compl. ¶ 27 (emphasis added). But that is not the same as saying that Anjum did not *actually know* about the proposed ordinances before the City Council vote. Even equipped with actual knowledge of the proposed ordinances, Anjum did not attend (or at least he fails to allege that he did) the City Council's public meeting in an attempt to be heard on the proposals. Anjum contends that there are severe Council-meeting limits on the opportunity to be heard and the length of time an objector may speak. But as far as the current record reflects, Anjum did not even try.

So, even if Anjum had a protectable property interest and some process was required before enacting the downzoning, Anjum had sufficient notice and an opportunity to be heard. The procedural due process claim must fail on the current set of allegations. The Court is skeptical that Anjum can amend this claim to validly state a claim, but given that the initial complaint was amended only to reflect the enactment of the ordinances, *see* R. 5, 8, and before any responsive pleading was filed, the dismissal of Count One as to Anjum is without prejudice. He may file a Second Amended Complaint to try to fix the procedural due process claim by April 6, 2022.

### C. Equal Protection

Next, Anjum alleges that the downzoning of the property violated his Four-teenth Amendment right to equal protection. Am. Compl. ¶ 88. Anjum does not prem-ise this claim on being a member of a protected class or on the violation of a funda-mental right. So only rational-basis review applies. *See Srail v. Vill. Of Lisle, Ill.*, 588 F.3d 940, 943 (7th Cir. 2009) (explaining that if neither a suspect class nor funda-mental right is implicated, then the proper standard of review is rational basis).

Generally speaking, "[r]ational basis review requires the plaintiff to prove that (1) the state actor intentionally treated plaintiffs differently from others similarly situated; (2) this difference in treatment was caused by the plaintiffs' membership in the class to which they belong; and (3) this different treatment was not rationally related to a legitimate state interest." *Srail,* 588 F.3d at 943. Anjum is asserting a "class of one" claim, that is, a claim in which the complaint "alleges that [the plaintiff] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). As the nomenclature of this type of claim implies, for "class of one" claims, the plaintiff need not allege that differential treatment of an entire class of persons. *Srail,* 588 F.3d at 943. There remains some uncertainty over the precise outer boundaries of class-of-one claims. *FKFJ, Inc. v. Village of Worth*, 11 F.4th 574, 589 (7th Cir. 2021) (noting the three-way split in the *en banc* decision of *Del Marcelle v. Brown Cnty. Corp.*, 680 F.3d 887, 899, 900, 913 (7th Cir. 2012) (*en*

*banc*). But those uncertainties do not affect the outcome of this case, as explained next.

Anjum successfully alleges the first element of a class-of-one claim, namely, that he was intentionally treated differently from similarly situated property owners. Out of 37 properties on the 2800 block of Milwaukee Avenue, only four—among them Anjum's property—were downzoned to B2-1. Am. Compl. ¶ 41. The specific ordinance challenged by Anjum, O2019-5846, specifically targeted Anjum's property for downzoning. *Id*. ¶ 39. Those factual allegations are enough to support the reasonable inference than Anjum was intentionally treated differently from similarly situated properties.

But remember that only the light touch of rational-basis review applies here. "[E]ven at the pleadings stage, all it takes to defeat a class-of-one claim is a *conceivable r*ational basis for the difference in treatment." *Miller v. City of Monona*, 784 F.3d 1113, 1121 (7th Cir. 2015) (cleaned up) (emphasis in original). For zoning decisions, the government fails rational-basis review only when "no sound reason for the action can be hypothesized." *Lauth v. McCollum*, 424 F.3d 631, 634 (7th Cir. 2005). Still, Anjum asserts that the City has failed to provide a rational basis for downzoning the four properties. Am. Compl. ¶¶ 51, 57, 93, 115. But the City offers seven interests served by the downzoning, contending that the ordinances:

> (1) serve the City's interest in local neighborhood preservation, aesthetics, continuity, and stability;

> (2) inhibit displacement of lower income families by the forces of gentrification or of established 'mom-and-pop' businesses;

(3) preserve the 'Main Street feel' of the North Milwaukee Avenue business corridor;

(4) better suit the actual bulk and density of properties along the business corridor;

(5) prohibit developers from tearing down historic, aesthetically pleasing properties or replacing 'mom-and-pop' shops with large business complexes permitted under the higher B2-2 designation;

(6) discourage investors from engaging in land banking along the business corridor by sitting on empty properties with high bulk and density designations in hopes of attracting wealthy developers to purchase them; and

(7) reduce the properties' bulk and density designations to incentivize owners to use their properties as actual operating businesses, rather than empty, vacant, or partially-vacant structures.

R. 28, Def.'s Reply at 7–8.

It is true that a few of these interests are proffered at levels of generality that are so vague that, if accepted, they would swallow any review at all. For example, there is little to zero concrete meaning in "local neighborhood preservation, aesthetics, continuity, and stability." Def.'s Reply at 7. Standing alone, this sweeping, generalized interest offers no content against which to measure the zoning decision: what exactly in the neighborhood is sought to be "preserv[ed]"; what "aesthetics" is sought to be maintained; and what does "continuity" and "stability" even mean in this zoning context? At least at the pleading stage, the generalized interest in simply preserving the neighborhood (whatever that means) is insufficient.

A different type of problem infects the City's assertion that the ordinances "better suit the *actual* bulk and density of properties along the business corridor." Def.'s

Reply at 7 (emphasis added). The problem is not that the interest is too generalized to have concrete meaning. Instead, the flaw is that, at the pleading stage, there is no way to evaluate the contention that the downzoning of Anjum's property (and the three others on the block) reflects the *actual* bulk and density of the corridor. It is true that the Amended Complaint contains a map of the Milwaukee corridor, but the map does not identify the bulk and density of the dozens of specific properties. *See* Am. Compl. ¶ 59. Discovery would be needed to fill in the factual gaps needed to assess this proffered interest.

Having said that, at least one of the City's proffered reasons provides a rational basis for the downzoning, specifically, to "discourage investors from engaging in land banking along the business corridor by sitting on empty properties with high bulk and density designations in hopes of attracting wealthy developers to purchase them." Def.'s Reply at 8. Anjum's property has been empty for around seven years. Am. Compl. ¶ 20. He says that he has tried to rent the space to tenants, but was once blocked by the 35th Ward Alderman and other times was unsuccessful. *Id.* ¶¶ 20–22. Still, the property has sat empty for around seven years, *id.* ¶ 20, and the City's interest in preventing land banking need only be *conceivable* to survive rational-basis review. *Miller*, 784 F.3d at 1121. And rational-basis review also recognizes the long-established principle that a legislature need not try to solve all problems all at once; instead, "the legislature must be allowed leeway to approach a perceived problem *incrementally*." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 316 (1993) (citing *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 461 (1955)) (emphasis added).

15

So the targeting of Anjum's property (and the three others that were downzoned on the block), instead of a widespread, all-at-once downzoning, does not undermine the rational basis for the ordinance.

It is worth noting too that this case is not like *Olech*, the Supreme Court case that respawned class-of-one claims. In *Olech*, homeowners asked to connect their property to a municipal water supply. 528 U.S. at 563. But the village demanded a much larger easement than it had ever required in exchange for the water connection. *Id.* After a three-month delay, the village relented and granted the connection without the larger easement, reverting back to the usual one. *Id.* On those facts, the Supreme Court held that the class-of-one claim could proceed because the village's demand was alleged to be irrational and the village relented. *Id.* at 565. Unlike here in Anjum's case, however, the village in *Olech* presented no reason at all (at least none is described in *Olech*) for demanding a much larger easement than ever before. Here, as explained earlier, the City of Chicago has offered several rational bases for enacting the ordinances, and at least one survives rational-basis review. The City has satisfied the low burden of rational-basis review, so Anjum's equal protection claim is dismissed. As noted earlier, because the first amendment to the complaint was only to add the enactment of the ordinances and was not a substantive change, the dismissal is without prejudice for now.

### D. Takings

Anjum also claims that the downzoning amounts to a Fifth Amendment taking (as incorporated through the Fourteenth Amendment's Due Process Clause) of his

16

property and thus he is owed just compensation. The Takings Clause declares that private property shall not "be taken for public use, without just compensation." U.S. Const. Amend. V. The City accurately characterizes the Amended Complaint as advancing two types of takings claims, one premised on *Agins v. City of Tiburon*, 447 U.S. 255, 260 (1980), and the second on *Penn Central Transportation Company v. City of New York*, 438 U.S. 104, 124 (1978). *See* Def.'s Br. at 17.

## 1. *Agins*

In the section of the Amended Complaint advancing the takings claim, Anjum in part alleged that the downzoning ordinance amounted to a governmental taking because it did "not substantially advance any legitimate state interest." Am. Compl. ¶ 114. This version of the taking claim can be quickly dispensed with, because it is premised on the now-discarded notion from *Agins v. City of Tiburon*, which held that whether zoning laws amount to a taking is in part dependent on whether the laws "substantially advance legitimate state interests." 447 U.S. 255, 260 (1980). The City accurately counters that the Supreme Court rescinded that holding in *Lingle v. Chevron, U.S.A. Inc.*, which explained that the state-interests inquiry "prescribes an inquiry in the nature of a due process, not a takings, test, and that it has no proper place in our takings jurisprudence." 544 U.S. 528, 540 (2005). Anjum correctly concedes the point. Pls.' Resp. at 14. This form of a takings claim is rejected.

## 2. *Penn Central*

Anjum argues that the zoning ordinance amounted to a regulatory taking under *Penn Central Transportation Company v. City of New York*, 438 U.S. 104, 124

(1978). *See* Am. Compl. ¶ 118 ("The ordinances interferes with reasonable invest-ment-backed expectations."). *Penn Central* is the seminal case establishing what qualifies as a regulatory takings. Government regulation that impedes on a property owner's use of the property—even without outright taking the property in its en-tirety—might still effectuate a taking depending on "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr v. Wisconsin*, 137 S. Ct. 1933, 1943 (2017) (citing *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001), and *Penn Central*, 438 U.S. 104, 124). Those specific factors express the long-established general principle that although "property may be regulated to a certain extent, if regulation goes too far it will be recognized as a tak-ing." *Penn. Coal Co. v. Mahone*, 260 U.S. 393, 415 (1922). In *Murr*, the Supreme Court recognized the competing objectives: on the one hand, a property owner has a "right to retain the interests and exercise the freedoms at the core of private property own-ership." 137 S. Ct. at 1943. On the other hand, most government regulation does not effectuate a taking given the "government's well-established power to adjust rights for the public good." *Id.* (cleaned up) (citing *Andrus v. Allard*, 444 U.S. 51, 65 (1979)).

**Economic Impact.** On the first *Penn Central* factor, that is, the economic im-pact of the regulation, Anjum has failed to adequately allege that the downzoning of his property has had much—or any—economic impact on the property's value. *Penn Central*, 438 U.S. at 124. The Amended Complaint contains only a *conclusion* of loss in value, rather than a concrete *factual* allegation. *See* Am. Compl. ¶ 55 (asserting

that the downzoning laws "substantially devalue" the properties). For example, Anjum has not alleged that an appraiser has evaluated what his property is now worth after the ordinance was enacted, compared to before the enactment. It is true that there is a fine line between validly requiring factual allegations and impermissibly demanding that a plaintiff provide evidence to support allegations. But in the context of a takings claim against a zoning regulation, where the government is given substantial leeway, and in the context of this specific case, in which Anjum's property has remained vacant since 2015, Am. Compl. ¶ 20—well before the downzoning— more actual factual allegations are needed. What's more, based on the current set of allegations, there is no suggestion that Anjum's building must be altered in some costly way—or any way at all—to come into compliance with the downzoned classification. Indeed, a "mere diminution in the value of property, however serious, is insufficient to demonstrate a taking" on its own. *Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 645 (1993); *see Home Builders, Ass'n of Greater Chicago v. City of Chicago*, 213 F. Supp. 3d 1019, 1029 (N.D. Ill. 2016). A zoning law might very well prohibit "the most beneficial use of the property" and yet not amount to a taking. *Penn Central*, 438 U.S. at 125. For these reasons, the first *Penn Central* factor weighs against deeming the Amended Complaint as sufficient to allege a taking.

**Investment-Backed Expectations.** The second *Penn Central* factor asks whether (and how much) the regulation interferes with reasonable and distinct investment-backed expectations. *Penn Central*, 438 U.S. at 124. Here again Anjum does

19

not provide any concrete factual allegations of specific investment expectations. Missing from the Amended Complaint are any allegations, for example, that Anjum had any specific plans for constructing more units on the property or that he is even anywhere close to the maximum number of residential or single-occupancy units allowed by the downzoning. All that Anjum says is a bottom-line conclusion that the downzoning has interfered with his investment-backed expectations; he does not speak to any specific investment plans. *See Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (noting that "courts should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements"). The second *Penn Central* factor weighs against Anjum.

**Character of the Government Action.** The third *Penn Central* factor examines the character of the government action, and draws a distinction between physical invasions versus ordinary land-use regulation: a taking "may more readily be found when the interference with the property can be characterized as a physical invasion by the government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central*, 548 U.S. at 124 (cleaned up). Indeed, "[z]oning laws are, of course, the classic example" of "permissible governmental action even when prohibiting the most beneficial use of the property." *Id.* at 125. Here, the character of the government action is the exercise of a municipality's heartland authority to decide zoning classifications.

All in all, then, none of the *Penn Central* factors come close to favoring Anjum's regulatory takings claim. On the current pleading, the takings claim fails to

adequately state a claim, so it is dismissed. For now, the dismissal is without preju-
dice to give Anjum a chance to replead the claim (though the Court is skeptical that
this claim can be fixed).

## E. State Law Claims

With Anjum's federal law claims dismissed, the Court exercises its discretion
to hold off on deciding the viability of the state law claims. In a case, like this one, in
which state law claims are premised on supplemental jurisdiction, "when the federal
claims are dismissed before trial, there is a presumption that the court will relinquish
jurisdiction over any remaining state law claims." *Dietchweiler by Dietchweiler v. Lu-
cas*, 827 F.3d 622, 631 (7th Cir. 2016) (*per curiam*) (citing cases). Indeed, this pre-
sumption is statutorily expressed in 28 U.S.C. § 1367(c)(3), which provides for the
discretionary relinquishment of jurisdiction over state claims when the claims provid-
ing original jurisdiction (here, federal-question jurisdiction) have been dismissed. If
Anjum is unable to fix the federal law claims in a second amended complaint, then
the state law claims would almost surely be remanded to state court. So it is best not
to opine on the state law claims at this point. Specifically, then, the dismissal motion
is terminated without prejudice as to Count 2 (Due Process Clause of Illinois Consti-
tution); Count 3 (Illinois Municipal Code); Count 5 (Equal Protection Clause of Illinois
Constitution); and Count 7 (Spot Zoning).

## F. Declaratory Judgment

Lastly, it is worth noting, for the sake of completeness and in light of the po-
tential relevancy in another round of pleading, that the City challenges all of Anjum's

requests for declaratory judgments due to the failure to comply with an allegedly required state statutory notice procedure. Specifically, the City points out that Section 11-13-8 of the Illinois Municipal Code requires that any person who wants to challenge a zoning ordinance in large cities (like Chicago) must first serve notice on owners of properties located within 250 feet of the property in question. Def.'s Br. at 20 (citing 65 ILCS 5/11-13-8, as well as 65 ILCS 5/11-13-7).

With regard to Anjum's state law claims, as explained earlier there is no need to decide the viability of those claims right now. So whether the neighbor-notice requirement of Section 11-13-8 applies to the state law claims in this case also need not be decided right now. There is reason to think that the requirement does apply, *see Scott v. City of Chicago*, 29 N.E.3d 592, 598 (Ill App. Ct. 2015), so Anjum (and any proper substitute for Salamah) should consider complying if they propose a second amended complaint. But there is no need to decide the issue definitively now.

The same kick-the-can-down-the-road approach applies to whether the notice requirement applies to the federal law claims. Because the federal law claims are dismissed for now, there is no need to examine whether Section 11-15-8 applies to them. It is worth noting, however, that it is not automatic that state law requirement applies to federal claims advanced under 42 U.S.C. § 1983. Federal law explains that state laws should apply to § 1983 claims only "so far as the same is not inconsistent with the Constitution and laws of the United States …." 42 U.S.C. § 1988(a); *see also Jefferson v. City of Tarrant, Ala.*, 522 U.S. 75, 79 (1997); *Robertson v. Wegmann*, 436 U.S. 584, 588–90 (1978). If Anjum repleads, and if he has not provided notice the

second time around, then the City can re-raise the notice requirement in targeting the § 1983 claims (but this time analyzing the issue under § 1988(a)). In any event, it would be inappropriate to definitively decide the issue now given the dismissal of the federal claims.

## IV. Conclusion

The federal claims advanced by Anjum are dismissed, for now without prejudice. Anjum may file a Second Amended Complaint to try to fix the federal law claims by April 20, 2022. If no new complaint is filed, then the dismissal of Anjum's federal law claims will convert to a dismissal with prejudice, and the Court will remand the state law claims. With regard to Salamah, he is dismissed from the case because he is not the property's owner. The trust that owns 2854 North Milwaukee may file a motion to substitute into the case in place of Salamah by April 6, 2022. If the substitution is granted (as it likely will be), then the trust should (if it still wants to be a co-plaintiff with Anjum) join in the Second Amended Complaint with Anjum. The tracking status hearing of March 25, 2022, is reset to April 15, 2022, at 8:30 a.m., but to track the case only (no appearance is required).

ENTERED:

    s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 24, 2022